REPORTED
IN THE COURT OF SPECIAL APPEALS
OF MARYLAND
No. 2556
September Term, 2014

JONATHAN SMALLS

v.

MARYLAND STATE DEPARTMENT OF
EDUCATION, OFFICE OF CHILD CARE

Eyler, Deborah S.,
Leahy,
Moylan, Charles E., Jr.
    (Retired, Specially Assigned),

JJ.

Opinion by Moylan, J.

Filed: December 16, 2015

The subject is res judicata. The aberrational nuance is that we are dealing with two adjudications by an administrative agency. The appellant, Jonathan Smalls, received on April 19, 2007, a family child care certificate of registration ("Certificate") from the Office of Child Care ("OCC") of the Maryland State Department of Education ("Department"). The Department, that initially issued but then twice revoked that certificate, is the appellee. Before even getting to res judicata, the inevitable first question has to be, "What is 'a family child care certificate of registration?'"

## The Significance of Registration

The case is controlled by Maryland Code, Family Law Article, Subtitle 5, "Child Care, Foster Care." Section 5-501(e) defines a "Family child care home" as "a residence in which family child care is provided for up to 8 children." Subsection (c) defines a "child care provider" as an "adult who has primary responsibility for the operation of a family child care home[.]"

Section 5-552(a) goes on to provide that "a family child care home...may not operate unless it is registered." Section 5-505(a) further provides that "a person shall be licensed by the Administration as a child care home before the person may exercise care, custody, or control of a minor child." Section 5-550.1 focuses specifically on the "Registration system." Subsection (b)(1), in pertinent part, sets out the "purpose" of the registration requirements:

> "b) Purpose – The purpose of registration of family care homes ... is to:
> (1) protect the health, safety, and welfare of children while they
> are in family child care[.]"

Subsection (c) confirms the legislatively declared linkage between proper registration and the health and safety of the children:

> "*Legislative intent.* – <u>The system of registration is intended to promote</u> a high degree of flexibility in the regulation of family child care homes and large family child care homes <u>while assuring the health and safety of children who are cared for in family child care homes</u>."

(Emphasis supplied).

Section 5-515 deals with the suspension or revocation of a certificate of registration earlier granted. It provides:

> "Subject to the hearing provisions of §5-516 of this subtitle, <u>if a licensee violates any provision of this subtitle or of a rule or regulation adopted under this subtitle, the Administration may</u>:
>     (1) suspend the license for a period not exceeding 1 year; or
>     (2) <u>revoke the license</u>."

(Emphasis supplied).

The reference to "a rule or regulation adopted under this subtitle" is a reference to COMAR regulations. It is COMAR 13A.15.13.07 that deals with the revocation of a certificate of registration. That section lists 14 separate regulations of which a certificate holder could be in violation. The first two are here pertinent:

> "A. <u>The office may revoke a certificate of registration if the</u>:
>     (1) <u>Provider</u> or home <u>is in violation of one or more of the regulations under this subtitle</u> and the health, safety, or welfare of a child in the home is threatened;
>     (2) <u>Provider</u> misrepresented or <u>offered false information on the application or on any form or report required by the office</u>[.]"

(Emphasis supplied).

## A Preliminary Glimpse at the Issue Before Us

On February 4, 2010, the OCC notified the appellant that it intended to revoke his family day care certificate of registration. He appealed the revocation to the Office of Administrative Hearings ("OAH"). Following a full hearing, an Administrative Law Judge ("ALJ") upheld the revocation. The appellant sought further review in the Circuit Court for Baltimore City. In a Written Opinion and Order filed on January 24, 2011, Judge Sylvester Cox reversed the finding of the ALJ and reinstated the appellant's certificate of registration. The Department did not appeal that decision of the circuit court. That decision represented a final judgment on the merits. It was also the predicate for all that followed.

On August 22, 2013, the OCC initiated a second attempt to revoke the appellant's certificate of registration. The appellant again appealed to the OAH. Following another full hearing on March 18, 2014, an ALJ rendered a decision on April 16, 2014 upholding the revocation of the appellant's certificate of registration. The appellant again appealed to the circuit court. On December 8, 2014, Judge Kendra Y. Ausby affirmed the decision of the ALJ. On this appeal, the appellant contends:

> 1. "The ALJ erred by denying appellant's motion for summary decision when appellant was entitled to judgment, as a matter of law, under the doctrines of collateral estoppel and/or *res judicata*"; and

> 2. "The ALJ's decision is not supported by substantial evidence and is erroneous as a matter of law."

(Emphasis supplied).

# Res Judicata

Res judicata is a common law defense. Maryland's recognition of the defense, by express name, goes at least as far back as 1885 with Brown v. State, 64 Md. 199, 1 A. 54 (1885). The Court of Appeals there quoted with approval from the Supreme Court's decision in Beloit v. Michigan, 74 U.S. 619, 19 L.Ed. 205, 7 Wall. 622 (1868), which, in turn, had quoted with approval from the English decision of Henderson v. Henderson, 3 Hare 100, 67 ER 313 (1843). In Brown v. State, 64 Md. at 203, the Court of Appeals held:

> "According to well-settled principles, our decision in the first case finally determined, as between the parties to the suit, all matters then adjudicated. As between these parties, no matter then decided can ever again become the subject of controversy."

(Emphasis supplied). See also Archer v. State, 74 Md. 410, 22 A. 737 (1891).

Section 1 of the Restatement of Judgments (1942) described the aim or purpose of res judicata:

> "Where a reasonable opportunity has been afforded to the parties to litigate a claim before a court which has jurisdiction over the parties and the cause of action, and the court has finally decided the controversy, the interests of the State and of the parties require that the validity of the claim and any issue actually litigated in the action shall not be litigated again by them."

(Emphasis supplied).

Professor Kenneth Culp Davis in his monumental Administrative Law and Government (1960), Ch. 18 "Res Judicata," p. 343, emphasized society's interest in repose:

> "The main idea is that a party should have his 'day in court' – his chance to win his case – and that once the tribunal has made a final decision and the time for rehearing or appeal or further appeal has expired, the result of the case becomes binding and cannot be reopened; the decision becomes

-4-

res judicata. <u>The reason for the doctrine of res judicata is that we don't want the court to have to consider the same claim over and over, and we don't want the defendant to have to defend over and over</u>. At some point in the presentation and determination of controversies, we want repose. <u>The objective of the doctrine of res judicata is repose</u>."

(Emphasis added).

## Administrative Decisions and Res Judicata

Both of the two sequential efforts by the OCC to revoke the appellant's certificate of registration led to respective hearings before the Office of Administrative Hearings, an administrative agency engaged in a quasi-judicial function. In this case, to be sure, both decisions by ALJ's were ultimately appealed to the Circuit Court and were ruled upon at that level. Lest there should be any doubt, however, as to whether the principles of <u>res judicata</u> apply with full vigor to decisions that were initially the quasi-judicial decisions of administrative agencies, a brief look at the undisputed case law may be appropriate. Although earlier Maryland decisions had, to be sure, strongly suggested that <u>res judicata</u> did not apply to decisions, even quasi-judicial decisions, of administrative agencies, the thorough-going analysis by the Court of Appeals in <u>Woodlawn Area Citizens Assn. v. Board of County Commissioners for Prince George's County</u>, 241 Md. 187, 194-96, 216 A.2d 149 (1966), worked a dramatic correction of course and brought Maryland into line with the more enlightened and majority view through the nation.[1]

---

[1]Reversing <u>Knox v. Mayor and City Counsel of Baltimore</u>, 180 Md. 88, 23 A.2d 15 (1941).

In <u>Neifert v. Department of Environment</u>, 395 Md. 486, 507, 91 A.2d 1100 (2006), the Court of Appeals well articulated the current law:

> "An administrative agency's decision is given preclusive effect based on three factors: (1) <u>whether the agency was acting in a quasi-judicial capacity</u>, (2) whether the issue presented to the circuit court was actually litigated before the agency, and (3) whether resolution of the issue was necessary to the agency's decision."

(Emphasis supplied). See also, <u>Stavely v. State Farm Mut. Auto. Ins. Co.</u>, 376 Md. 108, 116-17, 829 A.2d 265 (2003); <u>Batson v. Shiflett</u>, 325 Md. 684, 703-708, 602 A.2d 1191 (1992); <u>Sugarloaf Citizens Ass'n, v. Northeast Maryland Waste Disposal Authority</u>, 323 Md. 641, 658 n. 13, 594 A.2d 1115 (1991); <u>Murray International Freight Corp. v. Graham</u>, 315 Md. 543, 547-49, 555 A.2d 502 (1989); <u>White v. Prince George's County</u>, 282 Md. 641, 658, 387 A.2d 260 (1978).

In <u>Seminary Galleria, LLC v. Dulaney Valley Improvement Ass'n.</u>, 192 Md. App. 719, 735, 995 A.2d 1068 (2010), this Court, quoting <u>Restatement (Second) of Judgments</u> (1982), §83(1), stated:

> "<u>[A] valid and final adjudicative determination</u> by an administrative tribunal <u>has the same effects</u> under the rules of res judicata, subject to the same exceptions and qualifications, <u>as a judgment of a court</u>."

(Emphasis supplied).

## Claim Preclusion, Not Issue Preclusion

As a cautionary guidepost along the way, we note that there is a pervasive tendency for advocates litigating a <u>res judicata</u> question reflexively to throw in collateral estoppel almost as a doctrinal bonus, and for other advocates, raising a collateral estoppel issue, to

exhibit the same conditioned reflex with respect to <u>res judicata</u>. The two are not, it should be carefully noted, Tweedledum and Tweedledee. <u>Murray International Freight Corp. v. Graham</u>, 315 Md. 543, 546-52, 555 A.2d 502 (1999). Unlike Castor and Pollux or Damon and Pythias, <u>res judicata</u> and collateral estoppel may be separated. Indeed, they are far less confusing when they are kept carefully apart.

Just to clear away any possible clutter, therefore, let us point out that we are dealing on this appeal with <u>res judicata</u> and not with collateral estoppel. We are not here concerned with any factual decision on the ultimate merits so as to trigger issue preclusion under principles of collateral estoppel. <u>Janes v. State</u>, 350 Md. 284, 295-307, 711 A.2d 1319 (1998). Our concern is only with claim preclusion, which does not depend on any factual decision on the merits and is as concerned with what might have been litigated as surely as it is with what actually was litigated. <u>MPC, Inc. v. Kenny</u>, 279 Md. 29, 32-35, 367 A.2d 486 (1977).

Res judicata, moreover, is direct and not collateral. See <u>Klein v. Whitehead</u>, 410 Md. App. 1, 13, 389 A.2d 374 (1978) ("<u>Res judicata</u> is a direct estoppel, and collateral estoppel is what its name says it is."). In <u>John Crane, Inc. v. Puller</u>, 169 Md. App. 1, 27, 899 A.2d 879 (2006), this Court starkly distinguished the respective concerns of the two doctrines:

> "[T]he core concern of <u>res judicata</u> law is with the legal consequences of a final judgment in terms of <u>precluding the subsequent relitigation of the same case</u>. ...
>
> "By contrast, the concern of collateral estoppel law is with <u>the preclusion of duplicative fact-finding</u>."

(Emphasis supplied).

In Burkett v. State, 98 Md. App. 459, 464, 633 A.2d 902 (1993), this Court stressed the essential difference between these two very different preclusive defenses:

> "Collateral estoppel is concerned with the factual implications of an earlier litigation of a different case, whereas res judicata is concerned with the legal consequences of a judgment entered earlier in the same case. ... Res judicata, by contrast, is concerned with the legal consequences of a judgment regardless of whether the judgment was based on the ultimate factual merits or on the basis of a legal ruling having nothing to do with the ultimate factual merits."

(Emphasis supplied).

At a very high (almost ethereal) level of abstraction, there is a rough similarity between the two preclusive defenses. Indeed, they each preclude something. Each defense effectively asserts, "Having done something once, you are precluded from doing it a second time!" The two doctrines, however, then diverge sharply in identifying what that "something" is that was done the first time around and also in defining what "having done" something actually consists of. The failure to deal carefully with these critical distinctions can result in an utter breakdown in communication, as it threatened to do in this case.

The Department, as an example of what we are warning against, spends three pages of its appellate brief ostensibly refuting the appellant's defense of res judicata. The language of that refutation and the legal criteria invoked, however, are exclusively from the world of collateral estoppel, a subject which is not before us in this case.

The Department argues that "the issues in the 2013 proceeding were not identical to those in the 2010 proceeding." (Emphasis supplied). Of course, they were not and they do

-8-

not have to be for purposes of <u>res judicata</u>. It further argues, "Res judicata, also called issue preclusion, bars relitigation of an issue." <u>Res judicata</u>, of course, is not issue preclusion. It is claim preclusion and it is not concerned with factual issues as factual issues. The Department's brief goes on, "Issue preclusion does not require that the cause of action be the same, but it applies only with respect to issues of fact actually determined in the earlier proceeding." On the other hand, <u>res judicata</u>, which is before us in this case, does most definitely require that the causes of action be the same. <u>Res judicata</u> is not in the least concerned, moreover, with whether "issues of fact [were] actually determined in the earlier proceeding."

The Department concludes, "[Appellant] argues that the issues in both proceedings are identical. They are not." The Department makes a strong case that its second revocation attempt was not precluded by collateral estoppel. The appellant, for his part, has been just as undisciplined in framing his contention. As to both, the battle over collateral estoppel has been a tempest in a teapot. Both parties have been fighting a phantom that has nothing to do with this case.

### Through the Looking Glass

Just as a dispositive difference between <u>res judicata</u> and collateral estoppel is the distinction between a factual issue and a legal claim or cause of action, a potentially even more gaping difference may be in the subsequent dispositions of those respective predicates. In collateral estoppel law, the factual issue must actually be resolved on its merits by the factfinder before it acquires any preclusive effect. In <u>res judicata</u> law, by contrast, it is a legal

decision rather than a factual determination that concerns us. Unlike a factual determination, the legal decision, to enjoy preclusive effect, need not actually be made. It is enough that it could have been made. Therein lies a world of difference.

Grammatically speaking, the language we use in discussing and analyzing collateral estoppel law should be in the indicative mood. We are interested in what is. We are concerned with the here and now. In discussing and analyzing res judicata, by contrast, we are not so earthbound. We may, of course, employ the indicative mood and all that it portends, but we may also, alternatively, switch into the subjunctive mood. We may inquire about what legal decision was actually made, but we may also speculate about legal decisions that were never made, but might have been. We are invited to step through Alice's looking glass into an alternative reality. This is a world that collateral estoppel cannot imagine.

As Judge Levine explained for the Court of Appeals in MPC v. Kenny, 279 Md. at 33:

> "If ... the two causes of action are the same, and res judicata is therefore applicable, the first judgment would bar appellants, as urged by appellee, from raising any matters which could have been decided in that case."

(Emphasis supplied).

Alvey v. Alvey, 225 Md. 386, 390, 171 A.2d 92 (1961), speaks of the duty to raise in the first cause of action all matters that could there have been raised.

> "'It will not do to say that the facts relied upon in the second bill were not alleged in the first bill, and could not, therefore, have been proved in the first case, for the answer is, it was the appellant's duty to have either alleged them

-10-

in the first case, or to have shown in this case some good reason' for failing to do so.

> "We conclude that all questions of fact arising in connection with the present transaction between the appellant and the appellees have been litigated and determined in the first suit, <u>not only as to the matters and claims which were presented in that suit, but also as to all matters that could have been presented but were not</u>."

(Emphasis supplied).

In <u>Powell v. Breslin</u>, 430 Md. 52, 64, 59 A.3d 531 (2013), the Court of Appeals

reaffirmed:

> "Judge Allison's grant of summary judgment in *Powell I* was a final judgment on the merits at the time <u>it was</u> entered and, therefore, <u>was conclusive as to the matters decided in that case, as well as to 'all matters which with propriety could have been litigated in the first suit.</u>'"

(Footnote omitted; emphasis supplied).

This Court articulated the same principle in <u>Seminary Galleria, LLC v. Dulaney</u>

<u>Valley</u>, 192 Md. App. at 735, quoting <u>Whittle v. Board of Zoning Appeals</u>, 211 Md. 36, 49,

125 A.2d 41 (1946):

> "'If the second suit is between the same parties and is upon the same cause of action, <u>a judgment in the earlier case on the merits is an absolute bar, not only as to all matters which were litigated in the earlier case, but as to all matters which *could have been* litigated</u>.'"

(Emphasis supplied). See also <u>Richman v. FWB Bank</u>, 122 Md. App. 110, 152, 712 A.2d

41 (1998). <u>Res judicata</u> is concerned not only with **what was**, but with **what could have**

**been**.

## Identifying a Claim or Cause of Action

As we prepare to focus in more tightly on whether the Department's first revocation attempt of 2010 precluded, as <u>res judicata</u>, its subsequent revocation attempt of 2013, two of <u>res judicata</u>'s three elements pose no problem. In both of the legal proceedings under examination, the parties were the same – the appellant and the Department. In the first proceeding, moreover, there was a final judgment. When the Circuit Court for Baltimore City on January 24, 2011, reversed the decision of the administrative law judge and ruled that the evidence presented by the Department was not legally sufficient to justify its revocation of the appellant's certification, the revocation action was dismissed. That was a final judgment.

What remains to be analyzed is whether the claim or cause of action that was brought by the Department in 2013 was the "same" as the claim or cause of action that had earlier been brought by the Department in 2010. Identifying a claim and then properly labeling it, neither too narrowly nor too broadly, is an exercise in conceptualization. It is hard to describe this process in laymen's terms, but if we can do so, it should be a major step in truly understanding the process. In attempting to organize an assortment of issues, large and small, into a logical outline, we must identify which issues are deserving of Capital Letters in the outline and then determine which broader issues are actually worthy of Roman Numerals. A tricky question may be whether a particular Capital Letter is simply a subdivision under a Roman Numeral or is an integral part of the Roman Numeral itself. That is a question, moreover, that is not always free of ambiguity. In sorting litigable issues into

categories and in designating the categories, there inevitably is involved a certain degree of arbitrariness.

Maryland's first serious effort to articulate a workable test for determining whether two causes of action were the same for res judicata purposes was MPC, Inc. v. Kenny, 279 Md. 29, 367 A.2d 486 (1977). Judge Levine's opinion, 279 Md. at 33, described the "same evidence" test:

> "Courts elsewhere have applied a variety of tests in determining whether two causes of action are the same for purposes of invoking res judicata. The measure which seems to find favor with most courts, and one which we have applied, is whether the same evidentiary facts would sustain both actions. ...
>
> "Analysis of the issues framed by these two cases in light of the 'same evidence' test demonstrates that a different cause of action is presented here."

(Emphasis supplied). Significantly, that opinion noted that "[c]ourts elsewhere have applied a variety of tests" in resolving this question of sameness.

The seminal Maryland examination of what is the "same claim" for the purpose of res judicata was that made 10 years later by Judge Rodowsky in Kent County Board of Education v. Bilbrough, 309 Md. 487, 525 A.2d 232 (1987). At the very outset, the leitmotif was sounded: "The question presented turns on the application to the facts of this case of the elusive concept, 'claim,' as used in the law of claim preclusion." 309 Md. at 489.

In the Bilbrough case, this Court had relied on MPC v. Kenny and the "same evidence" test in holding that a plaintiff's second suit against the defendants was not barred by res judicata. The Court of Appeals did not reverse that holding per se, but it opined that

-13-

undue reliance on the "same evidence" test might "improperly narrow the scope of a 'claim' in the preclusion context":

> "Although we agree with the result reached by the Court of Special Appeals, we are concerned that sole reliance on the same evidence or required evidence analysis to determine if the same claim is involved in two actions may improperly narrow the scope of a 'claim' in the preclusion context."

309 Md. at 494. (Emphasis supplied).

In then making a case for a broader scope to be afforded the term "claim," the opinion, 309 Md. at 494-96, explored the "considerable evolution" that claim preclusion had undergone in the course of the Nineteenth and early Twentieth Centuries, relying heavily on Restatement (Second) of Judgments, §24, comment a, at 197. The earlier rigidity had been caused in large measure by the law's equating of the terms "claim" and "cause of action," on the one hand, with the legendary rigidities once inherent in the forms of action.[2] Judge Rodowsky, 309 Md. at 495, explained that Maryland had moved away from that earlier dependence on the forms of the action.

> "The Maryland law of claim preclusion has moved far enough from the influence of the common law forms of action that it seems to be settled here that a mere change in the legal theory, applied to the same set of facts previously litigated, will not in and of itself avoid claim preclusion."

(Emphasis supplied).

---

[2]As Frederick William Maitland reminded us in The Forms of Action at Common Law (1909): "The forms of action we have buried, but they rule us from their graves." Although there had been antecedent rumblings, the effective burial of the forms of action was the Judicature Act of 1873.

The more flexible approach recommended by the American Law Institute in its Restatement (Second) of Judgments is to equate the term "claim" or "cause of action" for res judicata purposes with the notion of a "transaction." Determining what is and what is not a "transaction" defies the application of any strict definition and requires a flexible or "pragmatic" approach. Section 24(2) of the Restatement emphasizes this essential flexibility:

> "What factual grouping constitutes a 'transaction', and what groupings constitute a 'series,' are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."

309 Md. at 498. (Emphasis supplied).[3]

In approving this flexible or "transactional" approach to identifying a claim or cause of action, the Court of Appeals made it clear that the transactional test "defies any attempt of abstract definitions which could be applied to all cases."

---

[3]Quite aside from the law of res judicata, the broadening of the concept of "claim" had been underway at least as early as 1968. As the Court of Appeals pointed out in Edmonds v. Lupton, 253 Md. 93, 252 A.2d 71 (1969):

> "As Judge Singley recently stated, for the Court, in White v. Land Homes Corp., 251 Md. 603, 610-11, 248 A.2d 159, 163 (1968), in construing the word 'claim' as used in both Maryland Rule 315 and Federal Rule 14 dealing with third-party practice:
>
> > "[T]he concept of a 'claim' ... has been defined as a 'group or aggregate of operative facts giving ground or occasion for judicial action' as distinguished from the narrow concept of a 'cause of action.'"

"We therefore generally approve of the approach to resolving the question of identity of claims found in §24 of the Restatement. We also agree with the observation by Schopflocher, supra, 21 Or. L. Rev. at 324 that the 'pragmatic' test 'defies any attempt of abstract definition which could be applied to all cases.' And Moore's Federal Practice at 361 doubts that the Restatement's substituting 'transaction' for 'claim' or 'cause of action' to describe the unit of litigation to which preclusive effect is given, '[b]eyond thus fortifying the already developed principle that a plaintiff may not relitigate a claim for relief by switching legal theories ... would make any very material change in the practice in the federal courts.'"

309 Md. at 499-500. (Emphasis supplied).

In DeLeon v. Slear, 328 Md. 569 (1992), 328 Md. 569, 589, 616 A.2d 380 (1992), the Court of Appeals reaffirmed Kent County v. Bilbrough and its use of the "transaction" test to identify the critical claims or causes of action:

"In determining whether claims are the same for purposes of res judicata, we have in the past sometimes utilized a 'same evidence' test. See MPC, Inc. v. Kenny, supra, 279 Md. at 33, 367 A.2d at 489. We have indicated, however, that the concept of a 'claim' is broad. See, e.g., Edmonds v. Lupton, 253 Md. 93, 252 A.2d 71 (1969) (defining a 'claim' as 'a group or aggregate of operative facts giving ground or occasion for judicial action, as distinguished from the narrow concept of a 'cause of action'.).

"Recently, in Kent County Bd. of Educ. v. Bilbrough, 309 Md. 487, 525 A.2d 232 (1987), we adopted the 'transaction' test, as set forth in §24 of the Restatement (Second) of Judgments, as the basic test for determining when two claims or causes of action are the same for purposes of res judicata."

(Emphasis supplied). See also, Gertz v. Anne Arundel County, 339 Md. 261, 269-70, 661 A.2d 1157 (1995) ("[W]e adopted the transaction test of §24 of the Restatement (Second) of Judgments as the basic test for determining when two claims or causes of action are the same.") (Emphasis supplied); Shum v. Gaudreau, 317 Md. 49, 54-56, 562 A.2d 707 (1989); Gonsalves v. Bingel, 194 Md. App. 695, 709-12, 5 A.3d 768 (2010); Patel v. Healthplus,

<u>Inc,</u> 112 Md. App. 251, 272-83, 684 A.2d 904 (1996); <u>Esslinger v. Baltimore City</u>, 95 Md. App. 607, 617-19, 622 A.2d 774 (1993). It is clear that the identification of the claim or cause of action will no longer be made in terms reminiscent of assumpsit or replevin or trover.

### The Second Revocation

It was on August 22, 2013 that the OCC initiated its second attempt to revoke the appellant's certificate of registration. The ALJ's decision upheld the revocation. On appeal to the circuit court, the appellant interposed the defense of <u>res judicata</u>, claiming that the second cause of action was the same as that which had been tried and failed in 2010-11. In its letter of August 22, 2013, the OCC informed the appellant that it intended to revoke his current family child care certificate of registration. Under the heading: "This revocation action is based on the following," the OCC articulated two bases for its action. The first was two-pronged in that it referred to documents submitted by the appellant with respect to 1) his own training and also with respect to 2) the training of Conswello Randall, his sister who was the "additional adult" assisting him in the home care operation. The charges were as follows:

> "A review of the record revealed that you previously submitted Certificates of Completion reflecting that you and Ms. Randall completed ninety (90) classroom hours of Growth and Development, Curriculum and Classroom Management training on December 19, 2008 at First Connections, Inc. You also submitted Certificates of Completion reflecting that you and Ms. Randall completed forty-five (45) classroom hours of Infant and Toddler training on November 7, 2008 at First Connection, Inc.

-17-

"On June 25, 2013 and on July 25, 2013, the OCC received information from First Connection, Inc. reflecting that they conducted a review of their records and have determined that neither you nor Ms. Randall completed the ninety (90) hour Growth and Development nor the forty-five (45) [hour] Infant and Toddler training at First Connection, Inc. and that First Connection, Inc. did not issue Certificates of Completion to you or Ms. Randall. This places you in violation of COMAR 13A.15.06.02, Training Requirements.

"You also submitted Certificates of Completion reflecting that you and Ms. Randall completed twenty (20) hours of Child Development and Guidance training through Care Courses on March 7, 2008.

"On June 25, 2013 and on August 5, 2013, the OCC received information from The Care Courses School, Inc. According to the information received a staff member of The Care Courses School, Inc. reviewed their files and determined that the certificates of completion submitted by you and Ms. Randall were tampered with and are not valid. This places you in violation of COMAR 13A.15.06.02, Training Requirements."

The second basis that the OCC gave for its intention to revoke the appellant's certificate of registration was an apparent conviction of the appellant for a larceny in New Orleans and his failure to notify the OCC thereof. The charge was as follows:

"The OCC is aware of a felony conviction you sustained on April 25, 2013 in New Orleans for the theft/stealing of Super Bowl tickets which led to a violation of probation hearing in Howard County, Maryland. That violation of Probation Hearing is currently scheduled for October 3, 2013. You failed to notify the OCC about your arrest in New Orleans. This places you in violation of COMAR 13A.15.03.05, Notifications."

(Emphasis supplied).

Those charges were fully litigated at the March 18, 2014 hearing before ALJ Jennifer M. Carter Jones. The ALJ found that the evidence did not support the charge that the appellant had failed to notify the OCC that he had been convicted of larceny in New

-18-

Orleans. The evidence also failed to support any violation of pertinent regulations on the part of Ms. Randall on the ground that she was not bound by the regulations.

What was proved with respect to the appellant, however, was sufficient to establish that he lacked the required training to qualify for child care certification:

> "I find that the Appellant's submission of fraudulent forty-five and ninety-hour training certificates merits the conclusion that the Appellant failed to complete the required training. Certainly, the appellant has submitted nothing indicating that he has done so. In light of the essential nature of the Appellant's training requirements, his failure to complete the required training left him without important information, mandated by the OCC, about child care, and threatened the health, safety, or welfare of children in the care of his family child care facility."

(Emphasis supplied).

Because the appellant had failed to demonstrate the necessary qualifications as a trained and competent child care provider, the ALJ affirmed the decision of the OCC to revoke his certificate of registration. On appeal to the circuit court, Judge Ausby in turn affirmed that decision of the ALJ. The appellant now argues that this revocation should have been barred by res judicata. Whether that is true, of course, will depend upon whether that claim or cause of action that was litigated in the second revocation of 2013-14 was, using the transaction test, the same as that earlier litigated in the first revocation attempt of 2010-11.

### The First Revocation

We will now look back to the first claim. The appellant first received his certificate of registration on April 19, 2007. It was three years later that the first effort to revoke that

registration was made with a letter to the appellant on February 3, 2010, announcing the OCC's intent to revoke. In giving its basis for the intended revocation, the OCC first laid out the general allegation.

> "The OCC has also been notified that there has been an on-going investigation of your facility by the Department of Human Resources, Office of the Inspector General (OIG). This investigation was prompted by allegations that you were providing fraudulent employment verifications for several individuals who expressed interest in having you provide child care services for them. These fraudulent employment forms were subsequently being submitted to DHR by you or by these individuals as alleged proof of employment for these parents applying for Purchase of Care (POC)."

(Emphasis supplied).

In four subsequent paragraphs, the letter spelled out in much greater detail the circumstances of the ongoing fraudulent practice. A sixth paragraph then announced that it was on the basis of that fraudulent and criminal behavior that the OCC had decided to revoke the appellant's certificate:

> "Based on the findings of the OIG's investigation, the OCC has concerns about your care of day care children. Your participation in preparing fraudulent documents to be used for the purpose of enabling these parents to be eligible to receive POC payments and your subsequent receipt of POC payments in many of these cases undermines the OCC's confidence in your ability to provide a safe environment for children. Your participation in these fraudulent schemes was not only serious but intentional. It raises reasonable doubt that you can provide for the welfare of children in your care."

(Emphasis supplied).

The appellant appealed that revocation decision and received a full two-day hearing before ALJ Brian Zlotnick on April 20 and May 5, 2010. The ALJ received in evidence 39 exhibits involving eight separate participants in the series of the fraudulent activities. Four

-20-

witnesses testified for the OCC. The ALJ found that the appellant willfully and knowingly participated in a series of frauds. On that basis, the ALJ affirmed the decision of the OCC to revoke the appellant's certification. The entire hearing, from start to finish, focused on the evidence of fraud and on nothing else.

On the appellant's appeal of the ALJ's decision to the circuit court, Judge Cox reversed the decision of the ALJ on the ground that the fraud per se did not prove that the appellant was a threat to the health, safety and welfare of the children in his charge:

> "We disagree with the ALJ's findings on this point and find that evidence of fraud alone, without threatening the health, safety and welfare of the children is [in]sufficient to find that Petitioner is unable to safely operate a daycare facility under COMAR 13A.15.13.07A(1) and (12). In light of the plain language of the regulation, which the Petitioner is alleged to have violated, the evidence presented by the OCC was insufficient to sustain the revocation of Petitioner's license."

(Emphasis supplied).

### The Two Claims Were Not The Same

To determine whether two claims were the same, it is necessary to delineate what is the scope or extent or dimension of the claim that was the subject of the first litigation. As a guide, we are now using the notion of a transaction. Although the reference to a "transaction" is helpful in giving modern meaning to the older terms of art "claim" and "cause of action," "transaction" itself is a term of art. Its full legal significance to the law of res judicata does not, as a self-evident phenomenon, leap off the page into the untutored eye. To give meaning to that term of art, Kent County v. Bilbrough, 309 Md. at 498, and 28 years

-21-

of Maryland caselaw following <u>Bilbrough</u> have made it emphatically clear that we look to

§24(2) of the <u>Restatement (Second) of Judgments</u>, at 196:

> "(2) <u>What</u> factual grouping <u>constitutes a 'transaction'</u> and what groupings constitute a 'series', are <u>to be determined pragmatically</u>, giving weight to such considerations as whether the facts are related in <u>time, space, origin, or motivation, whether they form a convenient trial unit</u>, or whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."

(Emphasis supplied).

The Comment to §24, <u>id.</u>, goes on to articulate the rationale for turning to the

transactional analogue:

> "a. <u>Rationale of a transactional view of claim</u>. In defining claim to embrace all the remedial rights of a plaintiff against the defendant <u>growing out of the relevant transaction (or series of connected transactions)</u>, <u>this Section responds to modern procedural ideas</u> which have found expression in the Federal Rules of Civil Procedure and other procedural systems."

(Emphasis supplied).

The Comment, at 198-199, makes it clear that the identification of the pertinent

transaction may defy a precise definition:

> "b. <u>Transaction</u>: <u>application of a pragmatic standard</u>. <u>The expression 'transaction</u>, or series of connected transactions,' <u>is not capable of a mathematically precise definition</u>; it invokes a pragmatic standard to be applied with attention to the facts of the cases."[4]

---

[4]This newly emerging character of a multi-factored and fact-specific transactional test for identifying a claim or cause of action augurs at some future time for a standard of judicial review for this particular aspect of <u>res judicata</u> law that may be based on the "abuse of discretion" rather than being a <u>de novo</u> determination of a purely legal question. There is an obvious range of differing conclusions that argues for some degree of subjectivity or

(continued...)

-22-

(Emphasis supplied). As guidance in the identification of claims, <u>Kent County v. Bilbrough</u> has truly been a game changer.

Based on this standard, we hold that the second revocation was not based on the same cause of action that was litigated in the first revocation. The second claim, therefore, was not precluded on <u>res judicata</u>. Looking first at whether "the facts are related in time and space," the first revocation related to a series of deals or arrangements that the appellant entered into in the years 2008 and 2009 with a number of his child-care clients. The second revocation, by contrast, concerned the production of false documents by the appellant himself relating to his job training. The time period in question would have been largely prior to his initial certification on April 19, 2007. None of the evidentiary exhibits submitted or the witnesses called at the first revocation hearing would have had any relevance at the second revocation hearing. None of the evidentiary exhibits submitted or the witnesses called at the second revocation hearing would have had any relevance at the first revocation hearing. In terms of factual evidence, these two hearing were mutually exclusive and watertight. They dealt with totally different events (or transactions). With respect to this criterion, the Comment to §24 of the Restatement, at p. 199, is particularly pertinent:

> "In general, the expression [transaction] connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin or motivation, and whether, taken together, they form a convenient trial unit for trial purposes. <u>Though no</u>

---

[4](...continued)
arbitrariness. Mercifully, that issue is not now before us.

> single factor is determinative, the relevance of trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held precluded."

(Emphasis supplied). In this case, there was absolutely no overlap.

In terms of "origin," the case against the appellant that led to the first revocation hearing originated externally. The OCC was notified that there was an investigation by the Department of Human Resources of the Inspector General. The case against the appellant that was presented at the first revocation hearing was based on the investigation that had been conducted by the Department of Human Resources.

By contrast, the origin of the case against the appellant that led to the second revocation hearing was exclusively internal. In April of 2013, two years after the first revocation matter was a fait accompli, the appellant submitted an application on behalf of a corporation owned by him, Developing Youth, for a child care center license. During the OCC's review of the application, it discovered that the appellant had submitted fraudulent documents in support of the application. The OCC denied the application. The appellant appealed that denial, but a hearing by the Office of Administrative Hearings affirmed the denial. The appellant did not appeal the ALJ's ruling.

It was this April 2013 encounter with the appellant, occurring entirely after the first revocation hearing had become a memory, that alerted the OCC, particularly when considering it in light of the earlier proven cases of fraud, to the appellant's predilection for fraudulent practices. It was this alert, of internal origin, that triggered the OCC's

investigation into the authenticity of the documents the appellant had earlier submitted to demonstrate his qualification for registration. What turned out to be the factual basis for the second revocation thus sprang from an internal origin, whereas the first revocation hearing, prompted by the Department of Human Resources, had an external origin. See Patel v. Healthplus Inc., 112 Md. App. 251, 274-75, 684 A.2d 904 (1996); Gertz v. Anne Arundel County, 339 Md. 261, 270, 661 A.2d 1157 (1995).

"Origin," of course, as a concept not yet explored by the caselaw, might have a very different meaning. To the moralist, the origin of the appellant's bad behavior that lead to the first revocation hearing might be characterized as the deadly sin of avarice, a desire for money he had not legitimately earned. The behavior that was under scrutiny at the second revocation hearing, by contrast, might have originated in his desire to obtain an occupational position and its rewards for which he had not qualified. While the umbrella term of "sin" could be a convenient common denominator for both, the primrose paths that the appellant's sin subsequently took toward the respective revocation hearings were diverse. So. A common origin or diverse origins? In the present Zeitgeist, now dominated by the transactional test, the diverse version would seem to be favored. This, on the other hand, may not even be what "origin" refers to.

To the extent to which the Restatement's suggested factor of "motivation" has some meaning separate and apart from the factor of "origin," the motivation for the respective revocation hearings can readily be seen as different. The motivation for the second revocation hearing and the motivation for the antecedent examination of the authenticity of

the appellant's documents offered in support of his initial application for certification was clearly the OCC's spontaneous desire to clear from its books a registrant who had consistently proved to be dishonest and deceitful. The motivation for the OCC to have initiated the first revocation hearing, on the other hand, may well have been what the OCC deemed to be its proper response to a complaint communicated to it by a sister agency. If "motivation" refers to the appellant's motivation, or motivations, rather than that of the OCC, those motivations have already been discussed.

Another factor suggested by §24 of the Restatement is that of whether the facts "form a convenient trial unit." The facts that were the basis for the first revocation – all of the evidence, all of the exhibits, and all of the testimony – were in and of themselves a "convenient trial unit" for that revocation hearing. None of those facts, however, would have had any relevance at the second revocation hearing. Conversely, all of the facts introduced at the second revocation hearing constituted "a convenient trial unit" for that hearing. None of them, however, would have had any relevance at the first revocation hearing.

Had the two sets of facts been offered, however, at a single hearing, they would not have formed "a convenient trial unit." There would simply have been two trials of two separate issues playing under the same tent in an administrative double header. Instead of harmony, there would have been cacophony.

The only common denominator between the first revocation and the second revocation was the relationship between the appellant and the OCC, to wit, the relationship between the registering agency and the registrant. Kent County v. Bilbrough, 309 Md. at

-26-

502, spoke directly to the inadequacy of such an ongoing relationship standing alone to establish identity between the otherwise disparate claims:

> "In order to accept petitioners' argument in support of the summary judgment, we would have to classify the entire employer-employee relationship between Bilbrough and the Board as the litigation unit. Only in that way would every allegation of a wrong occurring during the relationship become one 'claim.' So expansive a rule of claim preclusion would have the effect of a compulsory joinder of claims in a plaintiff's complaint, a requirement which the Federal Rules of Civil Procedure and the Maryland Rules have rejected."

(Emphasis added).

When §24 goes on to refer to the factor of the treatment of facts "as a unit conform[ing] to the parties' expectations or business understanding or usage," it is referring to a factor that is simply inapplicable to the circumstances of this case. Much of res judicata law and much of the language in the caselaw dealing with claims and causes of action and transactions comes out of the context of commercial transactions and business dealings. An administrative appeal, such as the one before us in this case, is on the far periphery of that commercial world and the everyday language of that world does not always translate easily into the distant hinterland. The very word "transaction" itself has a resounding commercial ring to it.

In distinguishing between analysis at the res judicata core and analysis in the outer zones of the res judicata ionosphere, we are reassured to find ourselves in company with Kenneth Culp Davis, Administrative Law and Government, Ch. 18, "Res Judicata," pp. 344-45:

-27-

"Administrative law must grapple not only with the problems of res judicata familiar to the judicial system – identity of claims and issues, identity of parties, final decisions on the merits, jurisdiction – but also with special problems growing out of the differences between the judicial process and the administrative process. The principle of res judicata is designed for adjudication, typified by a court proceeding, and many perplexities of res judicata in administrative law concern nonjudicial or unclassifiable functions. Courts normally apply law to past facts which remain static – where res judicata operates at its best – but agencies often work with fluid facts and shifting policies. The regularized procedure of courts conduces to application of the doctrine of res judicata; administrative procedures are often summary, parties are sometimes unrepresented by counsel, and permitting a second consideration of the same question may frequently be supported by other similar reasons which are inapplicable to judicial proceedings. The finality of unappealed judgements of courts is ordinarily well understood in advance, whereas statutory provisions often implicitly deny finality or fail to make clear whether or when administrative action should be considered binding.

"As a matter of principle, it is completely clear that the reasons behind the doctrine of res judicata as developed in the court system are fully applicable to *some* administrative proceedings. The reasons against a second litigation between the same parties of the same claims or issues are precisely the same for some administrative determinations as they are for most judicial determinations. The sound view is therefore to use the doctrine of res judicata when the reasons for it are present in full force, to modify it when modification is needed, and to reject it when the reasons against it outweigh those in its favor, and the courts generally follow this sound view."

(Emphasis added).

Accordingly, virtually every Maryland appellate opinion that has sanctioned the application of res judicata to the decisions of administrative agencies has been careful to add the limiting language "when the agency is acting in a quasi-judicial capacity." That limitation, however, was fully satisfied in the case now before us.

In any event, we are persuaded that the two claims litigated at the two revocation hearings were not, by the transaction test, the same claim. The litigation of the first claim,

-28-

therefore, did not estop the prosecution of the second. In implicitly or explicitly so ruling, neither the administrative law tribunal nor the circuit court on review abused its discretion. If, on the other hand, the issues come to us de novo as a matter of law, we do not hesitate to hold that the two claims were not the same and that res judicata did not bar the second revocation. Whatever the standard of review, the result is the same.

## Sufficiency of the Evidence

The appellant's second contention will not detain us long. Looking through the circuit court decision to the decision of the ALJ, we hold that there was substantial evidence to support the conclusion of the ALJ. In her Opinion and Order of December 8, 2014, Judge Ausby reached the same conclusion. We readily adopt her ruling as our own.

> "As previously stated in this Opinion, for each of the factual issues presented, the ALJ recounted the testimony and evidence presented and made an independent assessment as to the veracity and weight of each piece of evidence. Additionally, the record contained enough evidence for the ALJ to assess the credibility of each witness, including the Petitioner, despite his failure to attend the hearing. The Decision was deliberate, well-reasoned, and supported by the record evidence; therefore, reasoning minds can reach the same conclusion as the ALJ based on the facts here."

(Emphasis added).

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**